**SIGNED THIS: February 15, 2006**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ROSALIND C. LINDQUIST, | ) | No. 05-80566 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| I.H. MISSISSIPPI VALLEY CREDIT UNION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 05-8040 |
| | ) | |
| ROSALIND C. LINDQUIST, | ) | |
| | ) | |
| Defendant. | ) | |

### O P I N I O N

This adversary proceeding was tried before the Court on October 13, 2005, on the third amended complaint filed by I.H. Mississippi Valley Credit Union (IHMVCU) to determine the dischargeability of two debts owed by the Debtor, Rosalind C. Lindquist (DEBTOR), pursuant to Section 523(a)(2)(B) of the Bankruptcy Code.

The DEBTOR'S lending relationship with IHMVCU began in 1991. In April of that year, the DEBTOR filled out and submitted a document entitled "Master Application for All Credit." Under the category of loans and liabilities, on the line for mortgages or rental payments, the DEBTOR checked the box marked "own" and indicated on the bottom of the first page that only one payment was owed on her house. Over the course of the following thirteen years, IHMVCU made ten loans to the DEBTOR, considering her to be a good customer. After Kevin Duncalf became employed by IHMVCU in February, 2001, he approved most of the loans that were made to the DEBTOR.[1]

On September 11, 2001, the DEBTOR applied for and was made a loan by IHMVCU in the amount of $2,606.72. The loan application disclosed an existing loan to IHMVCU of $2,000. The credit agreement identifies the loan as Loan #4. The credit report obtained on the DEBTOR from Trans Union at that time disclosed a Chapter 13 bankruptcy filed by the DEBTOR in July, 1998. Loan #5 was made by IHMVCU on February 27, 2002, in the amount of $2,865.28. The balance due on IHMVCU'S prior loan is shown as $1,701. Loan #6 was made on May 9, 2003, in the amount of $3,704.23. The balance on IHMVCU'S prior loan was shown as $994.00

In early February, 2004, the DEBTOR applied for a VISA account by completing and returning a VISA application to IHMVCU. She listed her monthly income as $1,617.98. The DEBTOR checked the box indicating that she owned her home on the line for rent or mortgage payment and drew lines through the boxes for mortgage payment, purchase price and balance due. The only debt disclosed in the space provided for the listing of

---

[1]Loan records prior to 2001 are not available on IHMVCU'S computer system, unless those documents have been individually scanned in.

2

creditors was her current signature loan with IHMVCU. On the reverse side of the application, the DEBTOR authorized IHMVCU to transfer an existing balance on her Sears Master Card to the VISA account. On March 8, 2004, the DEBTOR'S application was approved with a $2,500 limit.

Loan #7 was made on May 20, 2004, in the amount of $3,188.67, for the purpose of home improvements. IHMVCU'S computer generated application showed a balance on the DEBTOR'S VISA account of $2,500, up to the credit limit. Proceeds of the loan of $2,188.67 paid off Loan #6 and $1,000 was paid to the DEBTOR. Loan #8 was made on May 26, 2004 in the amount of $3,543.99. The purpose noted on the loan application was "Miscellaneous Emergency." IHMVCU'S computer generated application showed a balance on the DEBTOR'S VISA account of $2,481. The DEBTOR received $350 in new money. Loan #9 was made on July 16, 2004, in the amount of $3,710.05, which called for payments of $220. The balance on the VISA account was $2,346. The DEBTOR received $500 in new money. Less than two months later, on September 3, 2004, IHMVCU made loan #10 for $3,567.93, which called for reduced payments of $200. The DEBTOR received only $85.93. The balance of the VISA account was $2,265.

The DEBTOR'S signature loans can be summarized as follows:

| Date | Loan No. | Amount | Refinanced Balance | Purpose | New money to DEBTOR |
|---|---|---|---|---|---|
| 9-11-01 | #4 | $2,606.72 | $2,000.00 | * * * | * * * |
| 2-27-02 | #5 | $2,865.28 | $1,701.00 | * * * | * * * |
| 5-09-03 | #6 | $3,704.23 | $  994.00 | * * * | * * * |
| 5-20-04 | #7 | $3,188.67 | $2,188.67 | Home Imp. | $1,000.00 |
| 5-26-04 | #8 | $3,543.99 | $3,193.99 | Misc/Emergency | $  350.00 |
| 7-16-04 | #9 | $3,710.05 | $3,210.05 | Miscellaneous | $  500.00 |
| 9-03-04 | #10 | $3,567.93 | $3,482.00 | Miscellaneous | $    85.93 |

The DEBTOR filed a Chapter 7 bankruptcy petition on February 11, 2005. At that time she was receiving $1,024.23 per month in workers' compensation benefits. In her Statement of Financial Affairs, she listed no income from employment for 2004 and $11,967.73 from her employment with Serv-A-Lite Products in 2003. According to the Statement of Financial Affairs, on account of a work-related injury she received $15,127.04 in workers' compensation payments in 2004. In her Schedule of Personal Property, the DEBTOR disclosed a workers' compensation claim against Serv-A-Lite Products arising out of an accident on January 25, 2003. The DEBTOR scheduled unsecured claims of $13,561.26.[2] In addition to the two debts owed IHMVCU, the following debts were listed by the DEBTOR:

| Creditor | Date incurred/consideration | Amount |
|---|---|---|
| Bank of America | 2003 - 2004; credit card purchases | $ 4,047.93 |
| Blue Cross/Blue Shield of Illinois | 2003-2004; back insurance premiums | 3,745.48 |
| Kohl's | 2002 - 7/04; credit card purchases | 665.57[3] |
| Sears Credit Cards | 1999-2004; credit card purchases | 23.80 |

The DEBTOR had no priority or secured creditors.

IHMVCU brought this complaint objecting to the dischargeability of both the VISA account and the signature loan dated September 3, 2004, identified as Loan #10. A trial was held on October 13, 2005. On that date the payoff balance on the VISA account was $2,446.77 and the payoff balance for the signature loan was $3,197.23. Three employees of IHMVCU testified on its behalf: Deborah Stevens, the loan officer who closed the signature

---

[2] The DEBTOR later amended Schedule F to also include her employer as holding an unsecured claim for advanced health insurance premiums in the same amount.

[3] The DEBTOR testified that no monies were owed on the Kohl's account on the dates she completed the applications.

4

loan; Donna Resse, a senior loan officer and collector; and Kevin Duncalf, the loan officer who approved the VISA account and the signature loan. The DEBTOR testified on her own behalf.

Kevin Duncalf testified that although he had never met the DEBTOR, he had approved several loans for her by telephone. Based on the frequency of the DEBTOR'S borrowings, Duncalf suggested in February, 2002, that she apply for a VISA account in order to accommodate her needs of $500 to $600 and eliminate the procedure of rewriting her signature loans. He testified that he mailed an application to her which she completed and returned to him. Duncalf approved the application with a credit limit of $2,500.

Duncalf testified as to the lending practices he followed at the time the signature loans were made. In contrast to the DEBTOR'S application for the VISA account, the application for the signature loans was paperless. The DEBTOR would telephone Duncalf and request a loan. Duncalf testified that he would pull up the DEBTOR'S prior loan application on his computer and ask her to update the information, inputting any changes. Much of the information on the application would carry forward from the prior application. Duncalf stated he would inquire, generally, of the DEBTOR regarding any changes since the last renewal. He admitted that he does not remember whether he asked the DEBTOR "point blank" whether she owned her home or any other specific assets. The liabilities section of the loan application would be completed with information obtained from IHMVCU'S internal records and information culled from a credit report obtained on the DEBTOR.

Duncalf explained that in determining whether to approve a loan, IHMVCU utilizes a debt-to-income ratio computed by dividing total monthly debt service payments by total monthly income. IHMVCU'S computer lending system calculates this ratio automatically. He stated that he then reviews the screen and makes a decision whether to grant or deny the loan. He stated that he relies on the information on the loan application in determining whether to approve the application, acknowledging that the member's payment history is most definitely taken into consideration in determining whether to approve the request. The loan application is later reviewed by two loan processors.

Donna Reese, a senior loan officer and collector for IHMVCU, whose job it is to work on past due accounts and bankruptcies, testified that when she compared the liabilities shown on the DEBTOR'S bankruptcy petition with those listed on the VISA credit application and on the application for loan #10, she noticed that the petition disclosed that the DEBTOR paid rent of $350 per month and that a couple of debts were included which had not been disclosed to IHMVCU. Ms. Reese testified that the debt to income ratio calculated on IHMVCU'S worksheet before loan #10 was granted was 26%, based on her income listed of $1,300 and without a monthly housing expense. Based on the figures disclosed in her bankruptcy petition, Ms. Reese's recalculation resulted in a debt to income ratio of 52%, which exceeded IHMVCU'S loan policy standard of 38% to 40%. Ms. Reese testified that if a member is in good standing, the information provided on the credit application is not verified. Deborah Stevens, the IHMVCU employee who closed Loan #10, testified that she did not know the DEBTOR and played no role in approving the loan.

The DEBTOR testified that she owned her house in 1991 when she first became a member of IHMVCU. She transferred her house to her son in 1996 and has paid him rent since that date.[4] The DEBTOR testified that she has been on disability since 2002 when she injured her shoulder. She had surgery on October 10, 2003, and has been receiving workers' compensation payments of approximately $1,000 per month since that date.

The DEBTOR'S testimony concerning the approval of her signature loans and VISA application was contradictory to the testimony given by Duncalf. The DEBTOR testified that she would call Duncalf when she wanted to borrow additional money and that he would either approve her request after a brief hold, or call her back, inquiring where she would like to pick up the check. When she went to the branch office, at the direction of the officer closing the loan, she would initial and sign the documents. The DEBTOR testified that other than the first loan, the loan officer never went over the documents with her and the procedure was routine and cursory. She has no specific recollection of requesting or procuring Loan #10.

The DEBTOR testified that she noticed the VISA account applications when she was in the branch office where she did her banking and that she took an application home and completed it on her own. She admitted that she mistakenly indicated that she owned her home, stating that she considered the house to be "in the family" because it was owned by her son. She testified that the monthly income listed of $1,617 is what she would have been earning if she had returned to work. At the time she completed the application, she had a doctor's appointment the following week and she expected that he would clear her to

---

[4]The DEBTOR testified that she gave her home to her son, which the Court interprets as meaning a gift, for no consideration. No details regarding that transaction were disclosed. This transfer occurred prior to the DEBTOR'S filing of a Chapter 13 petition in 1998.

7

return. The DEBTOR testified that she mailed the application to IHMVCU and never talked to Duncalf about it.

**ANALYSIS**

To further the bankruptcy policy of providing the debtor a fresh start, exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor. *Meyer v. Rigdon*, 36 F. 3d 1375 (7th Cir. 1994). The creditor bears the burden of proving each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

IHMVCU contends that the debts are nondischargeable pursuant to Section 523(a)(2)(B) of the Bankruptcy Code. That section provides:

> (a) A discharge . . . does not discharge an individual debtor from any debt–
> * * *
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
> * * *
> (B) use of a statement in writing–
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and
> (iv) that the debtor causes to be made or published with intent to deceive. . . .

11 U.S.C. § 523(a)(2)(B). To prevail on a claim under Section 523(a)(2)(B), a creditor must prove that (1) the debtor made a statement in writing; (2) the statement concerned the debtor's financial condition; (3) the statement was materially false; (4) the debtor made the representation with an intent to deceive the creditor; and (5) the creditor actually and reasonably relied on the misrepresentation. *Matter of Sheridan*, 57 F.3d 627 (7th Cir. 1995).

There is no dispute that the VISA credit application signed by the DEBTOR on February 24, 2004, and the signature loan application signed by the DEBTOR on September 3, 2004, are statements in writing respecting the DEBTOR'S financial condition.[5] A financial statement is materially false if it "paints a substantially untruthful picture . . . by misrepresenting information of the type which would normally affect the decision to grant credit." *In re Morris*, 230 B.R. 352 (Bankr.N.D.Ill. 1999), *aff'd,* 223 F.3d 548 (7th Cir. 2000). Under an alternative test, referred to as the "but for" test, the creditor must establish that but for the false representations, the credit would not have been extended. *Id.* Both tests have been utilized by bankruptcy courts in the Seventh Circuit.

IHMVCU contends that the applications are materially false because the DEBTOR misstated (1) her income; (2) her employment; (3) her home ownership; (4) her lack of house/rent payment; and (5) her existing debts. The VISA application, which is filled out in her own handwriting, shows that the DEBTOR owns her home and makes no monthly payment. She testified, however, that she did not own her home at that time and that she was paying her son $350 per month in rent. Based on the DEBTOR'S admitted income of only $1,000 per month, that omission is a material falsehood for purposes of Section 523(a)(2)(B).

---

[5]While a "statement regarding financial condition" need not be a formal balance sheet or income statement, the written document relied on by the creditor must be one from which a debtor's overall financial picture can be ascertained. *In re Cassel*, 322 B.R. 363 (Bankr.C.D.Ill. 2005). In this Court's view, the VISA credit application barely fits that bill. The top two-thirds of the single sheet application is taken up with general information on the applicant and co-applicant. In addition to requesting the applicant's monthly gross pay, the application includes a small space for filling in the source and net amount of additional income. The remaining portion of the form contains a blank for the name of the member's landlord or mortgage holder and spaces for the monthly payment, purchase price and balance due. Similar information is requested as to the member's vehicle. Four lines are provided for the listing of creditors. The first column is "Name of Creditor" followed by "Account Number," "Address of Reference" and payment information. Above the application for the applicant's signature, the certification includes the statement that the applicant(s) has listed all outstanding debts.

9

The VISA application also shows her income to be $1,617.98 per month, which was based upon an unrealized expectation that she would immediately return to full time employment. In light of the fact that she had been off work since 2002 or early 2003, however, the Court finds the statement as to current income to be a falsehood. Based on the significant difference between this figure and what she was receiving on workers' compensation, the discrepancy is material. Accordingly, the VISA application is materially false.[6]

The reference that the DEBTOR owns her home, preprinted on her application for the signature loan, does not render that application materially false. Unlike the VISA application, that application makes no inquiry as to any payment of rent being made by the DEBTOR. The section of the application for "debts," completed by Duncalf, lists categories of "high credit," "balance" and "payment." Given Duncalf's admission that he did not always inquire as to the DEBTOR'S current obligations when a loan was rewritten, her failure to include her monthly rent payment as a "debt" does not render the application false. But that application, listing her income as $1,300, exceeding her actual income by $300, was also materially false.[7]

Given this Court's determination that both the VISA application and the signature loan application were materially false, the next issue is whether the DEBTOR intended to deceive IHMVCU. Rarely is an intent to deceive proved by direct evidence in the form of

---

[6] In addition, in this Court's view, it is also a material falsehood for a debtor who is physically unable to work, and is receiving workers' compensation benefits, not to disclose that fact on a loan application, particularly where the period off work is substantial, as it was in the case at bar.

[7] This Court finds that IHMVCU did not establish that the debts included on the DEBTOR'S bankruptcy petition existed on the dates the loan applications were submitted. Those debts did not appear on the credit reports obtained by IHMVCU when the credit was extended.

an admission. An intent to deceive may be inferred if the debtor either knowingly or recklessly makes a false representation which the debtor knows or should know will induce the lender to make a loan. *Matter of Sheridan*, *supra*. A debtor's intent to deceive may also be inferred from the surrounding circumstances.

    The DEBTOR'S testimony that no inquiries were made as to her earnings, assets and liabilities after her initial signature loans with IHMVCU was emphatic. The monthly income of $1,300 appears on the application for Loan #4, submitted in September, 2001, as a preprinted figure. That same amount appears in loan applications, #7, #8, #9 and #10, also as a preprinted figure. The DEBTOR testified that she received a cost of living raise every year that she was employed by Serv-A-Lite. The application for Loan #10 is initialed by the DEBTOR, but not signed. There was no evidence that the DEBTOR was asked any specific questions by Duncalf relating to that application or that she even reviewed it before initialing it at the loan closing. Under the circumstances, the Court finds that IHMVCU has failed to prove that the DEBTOR published the Loan Application for Loan #10 with the intent to deceive IHMVCU.

    The same cannot be said of her VISA application, however. The DEBTOR'S representation on her VISA application that she owned her home and made neither a rent payment nor a mortgage payment is a blatant misrepresentation. She characterized the misrepresentation as a "mistake." The rationale offered by the DEBTOR was that she viewed her home, now owned by her son, as remaining "in the family." However, not only did the DEBTOR misrepresent her ownership of the house, she crossed out the space for

11

listing the monthly payment amount for rent or mortgage. Even if she was "confused" as to ownership, she knew she was paying $350.00 per month in rent and failed to disclose it in the designated space. Under these circumstances, the DEBTOR'S explanation simply doesn't wash. In addition, she overstated her actual current income by 66%. The Court finds that she made the misrepresentations on her VISA application with an intent to deceive IHMVCU.

The next consideration is whether IHMVCU actually relied on the applications, and if so, whether that reliance was reasonable. IHMVCU claims that its reliance on the DEBTOR'S applications was reasonable, given its history of loans with the DEBTOR. The DEBTOR contends that there was no reliance on the financial statements, but that the loan and VISA account were granted based merely on the DEBTOR'S standing as a good customer.

A creditor must show that it actually relied on the false representation, and that its reliance was reasonable. *Mayer v. Spanel Intern. Ltd.*, 51 F.3d 670 (7th Cir. 1995). The creditor need not have based its lending decision on the false financial statement alone, however, for even partial reliance may be sufficient. *In re Capelli*, 261 B.R. 81 (Bankr.D.Conn 2001); *Matter of Seaborne*, 106 B.R. 711 (Bankr.M.D.Fla. 1989). To show partial reliance, the lender need only establish that the false financial statements were a substantial factor in the decision to grant the loan. *In re Scarpinito*, 196 B.R. 257 (Bankr.E.D.N.Y. 1996). The reasonableness of a creditor's reliance is determined by the facts and circumstances of the particular case. *Matter of Bonnett*, 895 F.2d 1155 (7th Cir.

1989); *Matter of Harasymiw*, 895 F.2d 1170 (7th Cir. 1990). The reasonableness element requires the application of an objective, community standard of conduct. *Field v. Mans,* 516 U.S. 59, 70-71, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). The reasonableness of a creditor's reliance should be determined on a case by case basis. *Bonnett, supra.* In evaluating whether a creditor's reliance was reasonable, it is appropriate to consider the following three factors:

> 1. The creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices);
>
> 2. The standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and
>
> 3. The surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*In re Cohn,* 54 F.3d 1108, 1117 (3rd Cir. 1995). Where the debtor and the creditor have an ongoing relationship which has given rise to a relationship of trust, a creditor's reliance on the representations of the debtor may be deemed reasonable without additional verifying steps. *In re Watson*, 294 B.R. 198 (10th Cir.BAP 2003); *In re Joyner*, 132 B.R. 436 (D.Kan. 1991).

The Court finds that IHMVCU did not rely on the application for Loan #10, which was the latest in a long string of refinancings. Given the casual manner in which the signature loans were granted and renewed, as well as the minimal amount of new money

($85.93) borrowed by the DEBTOR with Loan #10, IHMVCU failed to prove that it actually relied on the loan application.

IHMVCU did prove that it actually relied on the VISA application. The VISA application, filled out by the DEBTOR in her own handwriting, was actually reviewed by IHMVCU before the VISA credit card was issued. Donna Reese testified that had the VISA application contained the correct information, the debt-to-income ratio would have exceeded 50% and the application would have been denied. This testimony was unimpeached and sufficiently evidences actual reliance.

The DEBTOR argues that the reliance was not reasonable since IHMVCU did nothing to verify the information set forth on the application and could have discovered that the DEBTOR was on workers' compensation through information contained in its own records. This argument is not persuasive. Absent a "red flag" on the application or in the loan file, a lender is justified in accepting as true information provided by a borrower, without conducting a behind the scenes investigation. Moreover, IHMVCU did pull a credit report on the DEBTOR, but that report did not disclose any information as to injury status or workers' compensation claims. Furthermore, IHMVCU followed its customary procedures in granting the VISA application and there was no evidence that those procedures and standards deviated from industry norms. The Court concludes that IHMVCU'S reliance on the VISA application was reasonable.

Judgment will be entered for IHMVCU as to the VISA debt, and for the DEBTOR as to Loan #10. In addition to the VISA balance of $2,446.77 plus contract interest to the

date of judgment, IHMVCU requested in the complaint an award of attorney fees in the amount of $500.00. The DEBTOR did not dispute IHMVCU'S entitlement to fees and the amount is reasonable. Accordingly, attorney fees will be awarded in the amount requested, plus costs of $150.00 for the adversary filing fee.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###